**D. C. TRANSIT SYSTEM, Inc., Appellant,**

v.

**Darryl BATES, an infant, by his father and next friend, Raymond Bates, Appellee.**

**No. 14385.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 24, 1958.

Decided Dec. 11, 1958.

Mr. Frank F. Roberson, Washington, D. C., with whom Mr. Jeremiah C. Collins, Washington, D. C., was on the brief, for appellant.

Mr. Clifford C. Kaslow, Washington, D. C., for appellee.

Before WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On June 29, 1955, Darryl Bates, then slightly more than six years old, came in contact with Transit's bus in P Street near its junction with Dupont Circle, and suffered injury to his foot. Through his father as next friend, he filed this action for damages, alleging the accident was due to the negligence of the driver in failing to stop or sound his horn to warn of his approach. The father in his individual capacity was also a plaintiff.

At the trial, Transit's motion for a directed verdict at the close of the plaintiffs' evidence was denied. The motion having been renewed at the close of all the evidence was again denied, and the case was submitted to the jury, which found for Transit as against the father but returned a verdict of $1,000 in the boy's favor.

Transit appeals, contending that no negligence on its part was shown and that, therefore, the trial court erred. in failing to direct a verdict in its favor. It also complains that the case was erroneously submitted to the jury under instructions which included the doctrine of last clear chance.

We briefly state the facts, as we gather them from the evidence and from the physical situation. On the evening in question Darryl Bates and his brother Schuyler, who was about one year older, lived with their parents at 1519 New Hampshire Avenue, N.W., four doors beyond Que Street and about one and one quarter blocks from Dupont Circle. After dinner that evening when it was still light, and with their father's permission, they went to a drug store on the south side of P Street, at its corner with Dupont Circle. In doing so it was necessary for them to cross Que Street, Connecticut Avenue and P Street. As the boys were going home from the store they had crossed the entire width of P Street and were standing on the sidewalk on the north side near the curb.[1] Their backs were toward P Street and they were arguing as to which should return to the drug store to exchange a purchase.

The appellant's bus was turning from Dupont Circle into the westbound lane of P Street and had a green light. Its speed had been reduced from 10 miles an hour to five, in order to make the turn. The driver saw the boys standing on the sidewalk but had no notice or intimation that one of them would run into the street. Darryl lost the argument with Schuyler and, although he had seen and understood the "Don't Walk" sign which faced him, dashed into the westbound lane of P Street on his way back

---

1. At its joinder with Dupont Circle, P Street is divided into east and westbound lanes by a concrete safety island which interrupts its total width for the protection of pedestrians. The boys had crossed both lanes on their return trip before the accident occurred.

to the drug store, and either struck the bus or was struck by it.[2]

When the driver saw Darryl suddenly start into the street, he applied the brakes and made an emergency stop. The bus came to rest with the right front wheel resting on the boy's foot. A bystander told the driver of this fact and he moved the bus slightly so as to release Darryl's foot. The bus operator did not remember whether he sounded the horn, and there was no affirmative evidence that he had done so.

■■ The question is whether these facts showed negligence on the part of the bus operator in failing to stop or to sound the horn when he observed the boys standing on the sidewalk. In an effort to show that the presence of the boys on the sidewalk made it his duty to give warning of his approach, the plaintiffs introduced into evidence and the court read to the jury in the course of his charge, § 54 of the traffic regulations then in force, which is as follows:

"Notwithstanding the foregoing provisions of this Article, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian *upon any* roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person *upon a roadway*." (My emphasis.)

The words we have italicized show the regulation did not require the driver to sound the horn. The boys were not in the roadway but in a place of safety on the sidewalk, with their backs to the street, giving no indication of an intention to enter the traveled way. In these circumstances, it was not the duty of the operator, by the regulation or otherwise, to sound a warning. He was justified in assuming the boys would not turn around and, against a "Don't Walk" sign, attempt to cross the street immediately in front of or against the side of his bus.

This phase of the case is much like Roberts v. Capital Transit Co., 1942, 76 U.S.App.D.C. 367, 131 F.2d 871, 872, where the plaintiff walked across a loading platform into the path of a moving streetcar. This court said:

" * * * The motorman of the car, even if he had seen her on the platform, would have been justified in assuming that she would not attempt to cross immediately in front of his car. * * * [The evidence shows] nothing to put the motorman on notice of her intention to cross ahead of his car, nor does it show that after she stepped down he could, in the exercise of reasonable care, have stopped his car in time. * * * "

The next question is whether the driver was negligent in not bringing the bus to a complete stop when he saw the boys standing on the sidewalk.

As the bus turned slowly into P Street with a green light in its favor and with "Don't Walk" electric signs barring pedestrians from crossing, the mere fact that two boys were standing on the sidewalk did not require the driver to stop and ask them if they intended to attempt the crossing. When he saw Darryl lunge into the street, the operator brought the bus to an abrupt and sudden stop. His very slow speed is attested by the fact that the vehicle stopped within about six feet after he saw the boy dart into the roadway. He was not required to do any more than he did.

In Capital Transit Co. v. Gamble, 1947, 82 U.S.App.D.C. 57, 160 F.2d 283,

---

2. The only evidence on the subject justified the inference that the boy struck or was struck by the side of the bus. There were no witnesses at the trial who had been present when the accident occurred except the bus operator and the two Bates boys. The driver did not undertake to say how the contact occurred and Darryl never saw the bus before the accident. His brother Schuyler, then, was the only eyewitness who testified as to the contact. He said "the side of the bus scraped his head."

284, a five-year old child was injured when it ran about 13 feet from behind furniture stacked on a sidewalk and into the side of a streetcar. This court said:

" * * * [T]he maximum time which the motorman had to avoid the accident was a little less than the time it took the child to run fast the thirteen feet. * * * We cannot see how the motorman could possibly be held to have been negligent in failing to stop in so brief a moment of time."

In the present case, Darryl ran about four feet from the curb and came in contact with the bus. Obviously the operator had much less chance to stop after he saw the boy move than had the motorman in the Gamble case.

Although it is immaterial here because there was no showing of primary negligence on the part of the bus driver, the truth is the accident was due solely to Darryl's act in running into the street without any indication of his intention to do so, against a warning light which he had seen and understood, and without looking for approaching traffic. This violation of a traffic regulation [3] was negligence *per se,* unless it can be said that, because of his age, Darryl was incapable of negligence.

█ The rule is that the question whether a six-year old child can be guilty of negligence depends on the child and the degree of intelligence it is shown to possess. Capital Transit Co. v. Gamble, supra. Darryl Bates appears to have been an unusually intelligent boy. He had been taught to recognize and obey traffic warning signals, and had been instructed never to cross a street alone. His mother said, with reference to him and his brother, "They had been alone before. And they had been very careful, to my knowledge, up until this happened." Whether Darryl was capable of negligence which was contributory in character would have been a jury question if the Transit bus driver had been shown to have been negligent. But, in the absence of such primary negligence without which there can be no liability, whether the boy was negligent is, as we have said, immaterial to the result.

In the Gamble case it was strongly urged by the appellee that a child of five could not be guilty of contributory negligence. After stating the rule which we have mentioned, the court said:

" * * * But where, as here, the evidence as to primary negligence produced by the plaintiff is so weak that to submit it to a jury would be to allow them to speculate as to the defendant's negligence the question of contributory negligence does not enter and the court should rightfully exercise its lawful discretion and withhold that evidence from the jury. * * * "

This language is appropriate here.

As the evidence did not show the bus operator was negligent in failing to stop or to sound his horn, and as no other act of negligence was alleged or proved, a verdict should have been directed in Transit's favor. That being true, we do not reach the question concerning last clear chance.

Reversed and remanded for appropriate proceedings.

DANAHER, Circuit Judge (dissenting).

The bus here involved, moving counterclockwise around heavily traveled Dupont Circle, had to pass as in an S-curve around an elliptical curbing in order to proceed westerly on P Street. A cross-walk extends from the north curbing of P Street to a safety island in the center of P Street. The exhibit before us indicates that the west-bound lane is so narrow that when the bus is swung to make a turn into P Street, no other vehicle physically could have "gotten in between the bus and the curb."

---

3. Section 12 of the District of Columbia traffic regulations, which forbids a pedestrian to cross a roadway in the direc-tion of a "Don't Walk" sign, was received in evidence.

The driver so testified, even as he said the accident was "about in the middle of * * * the traffic lane." The "closest" to the curb the right front of the bus "ever got was about four feet." Yet other evidence undoubtedly gave the jury a clear picture of how the bus was maneuvered in reverse-curve fashion from the circular lane of Dupont Circle to the point of its impact with the boy, but the foregoing physical facts suffice for present purposes.

The time element was short, as is so often true, only a few seconds at most. The driver had been required to stop twice for traffic signals after he had entered Dupont Circle. After his last stop prior to the accident he accelerated to a speed of approximately 10 miles per hour. "When I first saw the boys I was still accelerating. But I. hadn't turned out of the circle then. I was preparing to." "I don't believe I accelerated much more after that, because about the time I saw them I was getting ready to make the turn. And as soon as I started to make the turn, I rested my foot on the brake then."

So the jury could have concluded that when the driver first saw the boys, he was approaching at a speed of some 14 or 15 feet per second. He could have sounded his horn, but "I don't remember whether I did or not, no." The boy testified he heard no horn blown. The driver saw that the boys had their backs turned toward him, and the jury could have concluded that the driver had given no warning of his approach. The jury might well have reasoned that a bus driver should know that a small boy might start out into the street. If he were to do so, he might get into the path of the bus. A warning blast of the horn might have caused the oblivious boy to stay where he was.

But that is not all, for after deciding that the boys would stay where they were, the driver took his eyes off the boys. He looked to the left; he looked to the right; he looked into his rear view mirror to "make sure" that an automobile might not try to pass the bus when he swung it around the S-turn into P Street. While he did so, it is clear that the boy started into the crosswalk. The next time the driver saw the injured boy, the latter was moving "towards the bus," as the driver said. But the jury might have thought it more correct to say "as the bus moved toward the boy," for even after the impact, the boy lay in the crosswalk. The bus, making its turn, was then going about five miles an hour. Too late the driver saw the boy. He jammed on his brake and a near tragedy was averted, but the boy was injured. The driver had been trying to "make sure" no vehicle would try to cut in from the rear when the condition he could have made sure about was before him.

Thus it was for the jury to say whether or not there was a negligent failure on the part of the driver either to sound his horn when he saw that the boys, or one of them, might enter a position of danger, or continuously to maintain an adequate lookout toward the only spot whence danger might arise, or even to stop the bus if under all the circumstances the exercise of due care was deemed to require that step. One thing stands out in any event, the driver was possessed of abundant opportunity to make a condition of safety sure. He either disregarded the danger of harm, or formed his own decision upon the probabilities of the situation as he assumed them to be, and went ahead.

Under these circumstances, since the jury might have found the boy was in the cross-walk before the bus made its turn, it was not error to let the jury have the traffic regulation as a matter of guidance.

Next, it was already "settled doctrine" in this jurisdiction more than fifty years ago, and still is, "that the question whether a child of tender years has exercised such care as would reasonably be expected from a person of his age and capacity is a question for the jury,

and to be determined by the circumstances of the particular case."[1]

And finally, it is enough that the circumstances were such as to indicate a reasonable chance that the boy was inattentive and would not discover the approach of the bus. The driver was not entitled to act upon his own assumptions when it was within his power to make a reasonable effort to avoid injury.[2] Thus, if "under one view of the evidence, the accident might have been prevented had the servant acted with prudence and promptness, it is for a jury to say whether a recovery may be had."[3]

---

1. Barstow v. Capital Traction Co., 1907, 29 App.D.C. 362, 373.

2. Restatement, Torts § 480, comment b.

3. Barstow v. Capital Traction Co., supra note 1, 29 App.D.C. at page 378.